Dan Hartzog Jr. Over the recent years the Supreme Court has issued a number of decisions clarifying the In this case, the district court did not apply the correct standard for the qualified immunity analysis. In the opinion of the district court, they rely on cases such as Tennessee v. Garner and the types of broad statements of law rather than finding a case that is similarly situated to the situation at hand. In addition, the court took facts that were not supported by the evidence. If you read the opinion, you'll see that there are various statements of fact without citation to the record. Counsel, can I stop you there for a minute? Because I appreciate the fact that a lot of your argument is about the district court having misread the factual record. But in this posture where you're on appeal of a denial of qualified immunity, we don't actually have jurisdiction to reach those questions. We can hear this case, but the thing we lack, and I'm quoting from our opinions, we lack jurisdiction to review the district court's order insofar as the order determines whether or not the pretrial record sets forth the genuine issue of fact. It's not just that that's a hard standard to overcome. We literally can't address those questions. Your Honor, I think what you can address is the denial of qualified immunity. But I just want to make sure that we're getting off on the right foot. We cannot address your arguments that the district court, just what you started to say, sort of misunderstood the record and didn't cite to the record and found disputes of fact where there weren't any. Correct, Your Honor. But our contention is that the denial of qualified immunity is based on the facts presented by the plaintiff in the case. In other words, the facts in the light most favorable to the plaintiff should have granted summary judgment because of qualified immunity. And our main contention is that the district court just did not do the correct analysis. Can I ask just a clarifying question before you get into the particulars of the arguments? There were issues that the court ruled against you that your opponent has said you haven't appealed. And it doesn't look like you've appealed them. It's excessive force in Mr. Cardwell's case and excessive force in Mr. Bethune's case. And I just wanted to clarify that you are not appealing the ruling against you on qualified immunity on those excessive force claims. Is that right? That is correct, Your Honor. In fact, we did not even move for summary judgment on the excessive force in the Cardwell case. But the district court extensively denied it, even though we didn't actually move for that. Thanks. So this case began, or the Livingston case began with an assault that took place. And Deputy Cahagas took a call from dispatch saying that a female had been assaulted by two individuals, one of whom was known, one of whom was unknown. This is Livingston? We're going to Livingston? Correct, Your Honor. I'll start in Livingston. Deputy Cahagas was looking for the identity of the second assailant so that the Deputy Cahagas knew he couldn't make an arrest because it was a misdemeanor that occurred outside of his presence. But he could find out who the second assailant was. He went to 172 West Everett where he had reason to believe the known assailant may be Lonnie Setzer. He believed maybe at that location Lonnie Setzer testified in this case that he did stay there on occasion. Deputy Cahagas said he thought... He gets there at 3.40 a.m. Is that right? Correct. Why does he show up at 3.40 a.m.? The assault call came in at 3 a.m. It was shortly after the assault call. Deputy Cahagas was tied up on another call by the time he got with the assailant. That's what time it was. So he goes to the house. There's no contention or there could be no contention that going to the house and knocking on the door is a violation of anyone's rights. He has the right to speak. Deputy Cahagas has a conversation with John Livingston. All three witnesses who were in the home agree that they don't recall exactly what was said during that conversation. Deputy Cahagas' testimony was that he asked John Livingston whether anyone else was in the home and John Livingston said no. At the same time, he observes other people in the background. He's conducting a lawful investigation because... There was a dispute there that there was testimony that he asked specifically if Lonnie was in the home. That is correct, Your Honor, that he asked if Lonnie was in the home and one of the witnesses testified to that, but that was only one piece of the conversation. And the contention essentially is, well, because one witness testified that that was said and didn't say that anything else was said, that there is some dispute of fact. And that is precisely the issue we do not have jurisdiction to consider, so please go on to your next point. And I understand that, Your Honor. But just the evidence that the witness said one thing was said is not evidence that another thing was not said. The district court, though, found that the record showed a dispute of fact on that point and we don't have jurisdiction to review that finding, so let's assume there's a dispute of fact on that point. The other ground that Deputy Cahagas had for arrest in that situation was assault. He was standing in or at the threshold of the door and when John Libison closed the door, it struck Deputy Cahagas. The district court says there's a dispute of fact on that point, too, right? The district court, without any citation to anything. It doesn't matter. We don't have jurisdiction. The district court said there's a dispute of fact? The district court said that had Deputy Cahagas crossed over the threshold, it would have been an injury. The district court also said that the witness said he either was on the porch or he was inside the house. The district court did not make a finding as to whether he had entered the house. Right. The district court said there's a dispute of fact as to whether the foot was in or out, whether it was intentional. All of that is disputed. But I don't believe the district court said that that was the disputed fact that gave rise to the denial of qualified immunity. In any event, there's a dispute of fact on that. What Deputy Cahagas knew was that the door hit him, and a reasonable officer under that situation could believe that he had probable cause for assault. He's standing in a public place under U.S. v. Santana. The threshold of the doorway is a public place, and the district court did not even address U.S. v. Santana. Instead, they relied on a case where the person was inside the home and had never exited the home. The plaintiff's argument is essentially that this is not a hot pursuit case because the plaintiff was inside the home. But under U.S. v. Santana, that's exactly what the U.S. Supreme Court said did justify a hot pursuit, where someone is standing in the threshold of the doorway. There's a crime committed, or there's reason to believe that a crime is committed, and the officer can follow the person into the home under a hot pursuit doctrine. The Supreme Court has clarified that misdemeanor hot pursuit is not decided. In other words, a reasonable officer could believe that he has the right to enter the home for a misdemeanor hot pursuit, which is what Deputy Cahagas did in this situation. Once he enters the home, the evidence in the record, and the court found Deputy Cahagas said you're under arrest and that John Livingston refused to submit to the arrest. The cases relied on by the court and by the plaintiffs in this case are cases where there was no order that you're under arrest, put your arms behind your back. There was just a sudden use of force without warning. That's not the case here. There was a warning. There was a you're under arrest, put your arms behind your back, and that's when Deputy Cahagas attempted to grab John Livingston. John Livingston resisted for a period of at least five minutes. Under the Armstrong case, the force hit in 2016, which postdated this case by a couple months, said that you're entitled to qualified immunity. The officer in Armstrong was entitled to qualified immunity for use of the taser on a passive resistant subject who had not committed a crime. It was an involuntary commitment. There was much more resistance in this case, and the officer had reason to believe that the individual had committed a crime. And so I think under the Fourth Circuit holding in Armstrong, qualified immunity should be clear that when you're faced with a resistant subject who you're trying to place under arrest, in 2015, as held by this court in January of 2016, a reasonable officer would have believed that they were entitled to use escalating force, hands-on approach, taser, pepper spray, which is addressed in the Armstrong case as well, in order to gain compliance. Can I ask you a question? If we assume just for a minute, just assume with me, that the district court found this dispute a fact as to whether there was any grounds to make an arrest in the first place. If there's no grounds to make an arrest, then isn't any use of force used to effectuate the arrest also unreasonable? If you don't have the authority to make an arrest, surely you don't have the authority to use force to effectuate the arrest. It's a general proposition, I believe. These two things kind of travel together. Correct, although the Supreme Court in U.S. v. Mendez clarified that you can't look at one Fourth Amendment violation and then consider everything after that sort of tainted. No, I'm not saying that. I'm just saying if there's no authority to make an arrest, then there's no authority to use force to make an arrest. I agree with that proposition, Your Honor, although I think what the case is here is that there was at least a reasonable officer may believe that there was probable cause to make an arrest, and in the qualified immunity context, that's what the court should look at. It's not was there ultimately probable cause. It's did a reasonable officer believe that there could have been probable cause. The district court held that there were disputed facts on that question. I believe the district court held that he didn't have the right to use any force because there was no right to make the arrest. I believe the district court erred in that. As to the arrest, the district court found the disputed facts. Right. When John Livingston resisted arrest, and there's no dispute that none of the force used by Deputy Cahagas was successful in overcoming the resistance by John Livingston. Throughout the duration of the struggle, which according to the taser logs at the very least was more than five minutes of trying to get John Livingston in handcuffs. Unsuccessfully. Pepper spray did not work. Taser did not work. Nothing seemed to work to get him under control. When they got out onto the porch, John Livingston was able to get the taser away from Deputy Cahagas. Isn't that also in dispute? That is not in dispute. If you look at the court's order, it says that John Livingston at least had it on his finger. The only witness who knew where the taser was, or the only witness who said anything about it, was Clayton Carroll, who said that Livingston did not have control of the taser until the end, and that Livingston had it on his finger, that it was going off. Bradley Timmerman, who's another witness, said that the taser may have zapped Deputy Cahagas. Clayton Carroll acknowledged that the taser may have gone off and may have hit Deputy Cahagas. The way the district court summed it up was that Livingston appears to have touched the taser in an attempt to remove it from his body, but he did not possess control of it, nor did he tase the defendant. So we, again, just in this particular posture, if you guys come back to us after a final verdict, we can look at everything. But for now, we can't look behind that. So on those, you have to explain, just assume for now that that's the fact. The issue is not whether he ultimately had control of it. The issue is whether Deputy Cahagas could have reasonably believed that he was in danger based on having been disarmed of his taser and it being at least not in his possession and possibly in the possession of John Livingston, who the best evidence is that it was on his finger going off. And two of the witnesses say it may have zapped him and the other witness was inside the house and had no opportunity to view what happened before the shots. The reasonability of an officer's belief on that, not just where the taser is, but also the condition of Mr. Livingston at the time, any testimony about his ability after the tasings and the pepper sprays to be a threat, we have to consider that as a whole package when considering what a reasonable officer would believe. I think what Deputy Cahagas would have known at the time is that this is an individual who still was not under control, still struggling, still fighting, and it's been characterized as passive resistance. But a five-minute struggle where they're unable to get someone in handcuffs, they don't know whether he has a weapon at this point. They have not had the opportunity to search. Is there any indication that they, any evidence of a weapon? I feel like this is the first I'm hearing of that. He did not have a weapon. But the officers did not know that at the time, nor would they have been able to know that. Did they testify that they thought he had a weapon? They testified that he was putting his hands toward his waistband and they had not had the opportunity to search for a weapon and that that concerned them. That's actually why Deputy Cahagas at one point drew his firearm during the middle of the struggle, told him to move his hands out from under him, and reholstered his weapon, which is all in the record. So assume for the moment Judge Harris' characterization of the evidence, which is, I believe, accurate, but your point, I think, is well taken, that you look to the reasonable perception of the officer at the time, and I think the record suggests that he indicated he's got my taser or something to that effect. I assume that's true. So does that, in turn, then warrant the use of deadly force to combat what most courts define a taser as being something that is short, deadly force? I think under this court's precedent in Armstrong, a taser is a dangerous weapon, and there's no dispute about that. And Deputy Cahagas, I think under qualified immunity analysis, which is what we're under here, there is no case that I'm aware of that the courts, that the district court pointed to, the plaintiffs have pointed to, saying that when an officer is disarmed of their own taser following a prolonged struggle where they are unable to get the individual in handcuffs, that an officer cannot use deadly force in that situation. And I think that's the underlying issue on the Livingston case, is there is no... There are two officers in the room, right? There was one other officer there at the time. Deputy Cahagas' assessment is he did not know where he was. He was not there? He was there, but Deputy Cahagas, at the time he fired his weapon, did not know where Deputy Warblow was. But he was there? He was in the room? He was at that location. Where else would he be? If I may, I'll save the rest of my time. All right, thank you, Mr. Hartog. Mr. Ballew? Yes. Good morning. May it please the Court, Matt Ballew from the North Carolina Bar, along with Robert Zaytoon, Ken McOtter, and Jesse Jones, we represent each of the plaintiffs in this consolidated 1983 action. And as the Court has already identified, this case is replete with disputed facts. And we agree, Judge Harris, with the Court's observations and comments, that with respect to those facts as articulated by the district court in its order denying summary judgment, the defense has no ability to argue that on this interlocutory appeal. And this Court must accept those facts as we must, as articulated by the district court. And on those facts, in the John Livingston case, which rightly has the main focus here today in this argument, on those facts as articulated by the district court and viewed in the light most favorable to the plaintiff, the non-movement, at 3.40 in the morning Deputy Skahagas and Warblow arrived at John Livingston's home where it is undisputed. They had no warrant of any kind, no exigencies existed of any kind, and they had no probable cause of any kind. Mr. Skahagas knocked on the front door and Livingston answered, remaining inside the home, which is a key factual distinction recognized by the Court in U.S. v. McCraw, which clearly distinguished the holding in Santana, the case relied upon by the defense in McCraw, where the officers did have probable cause to arrest and did have probable cause to arrest on the basis of having just observed criminal drug activity happening moments before outside of a hotel room where the occupant of that room merely opened the door but remained inside and then shut the door. This Court held very clearly that he did not give up his expectation of privacy in the holding in Santana of a hot pursuit because standing on the threshold of the doorway does not apply. And in this case, Mr. Livingston was not standing in a public place, never stood on the threshold of the doorway, and the evidence is, and it is undisputed, that Mr. Livingston remained inside his home where his constitutional protections are at their peak. Livingston committed no crimes while at the door, communicating peacefully with Officer Cahagas. He exercised his right to deny him entry when he asked, do you have a warrant, and Cahagas responded no. Mr. Livingston exercised his right to, as Mr. Carroll, the eyewitness, testified, calmly shut the door completely closed without touching Mr. Cahagas. I disagree with my opponent when he represented that it was an undisputed fact that the door struck Deputy Cahagas. That is, in fact, a highly disputed point of fact. Mr. Carroll testified that Mr. Livingston shut the door calmly, completely closed, and that Cahagas, after several seconds passed, bashed or kicked the door open, breaking the frame and hinge of the door. And I also disagree with my opponent on another key dispute of fact. Mr. Hartsog said that we are relying on cases that are distinguishable because there was a sudden use of force without warning or command. In this case, the facts are, as articulated by the district court, that Deputy Cahagas walked into Mr. Livingston's home where he was seated in his lazy boy recliner and jerked him up physically out of the recliner with no commands, with no orders. And it was only then that he instructed him to put his hands behind his back and told him you're under arrest, to which Mr. Livingston responded, for what? I've done nothing wrong. The district court did rely on the appropriate cases which show that Mr. Livingston's constitutional rights throughout this entire incident were, in fact, clearly established as of November 2015. We rely on those same cases. The case I would like to point out to the court on that first would address the excessive force claims inside the home. And the reason I address that first is because that case law applies equally to the deadly force, the moment deadly force was used on the porch. But the case of Smith v. Ray on the excessive force claims provides clearly established law at the requisite level of specificity on the facts and was cited and relied upon by the district court in its opinions. In the Smith case, it was held that the officer's conduct in 2006 was clearly established to violate the citizens' constitutional rights. Counsel? Yes, ma'am. Do you agree that the Smith, Smith is a little different because the officer never told her, you're under arrest, put your hands behind your back. She, the court said she instinctively pulled her arm back because she's being grabbed by someone with no cause. And the court mentioned a couple times that the officer remained silent. The officer never answered what she, what was happening. In her perspective, she wasn't trying to accomplish an arrest. She wasn't resisting an arrest. And that distinguishes it from this case from the perspective of the officer. I would agree that the facts of Smith show that the officer never stated you are under arrest. However, the facts of Smith were clear that the officer, when attempting to effectuate the arrest in a very, very similar manner to the Livingston case, repeatedly commanded and instructed the suspect or the citizen to give me your hands, give up your hands, give up your hands, to which she repeatedly refused. And just like Mr. Livingston, there's another disagreement of fact. My opponent says that the facts show Mr. Livingston was reaching for his waistband. That's simply a dispute of fact. Just like in Smith, Mr. Livingston kept one hand under his chest, exactly like the young lady in the Smith case, when the officer repeatedly commanded give me your hands. And the relevant facts that show clearly established rights under Smith would include not only those facts, but the fact that the officer approached a private residence and suspected a person of interest being inside. The victim who opened the door actually did relinquish her expectation of privacy by stepping outside and spoke calmly with the officer. And as this court noted in Smith, at most, she was suspected of a nonviolent misdemeanor, at most, which would be similar to Livingston. The officer physically grabbed her when she tried to walk away. Each time she was grabbed, she instinctively resisted and pulled her arms away, asking the officer what was happening. The officer then used the victim's resistance as an excuse to slam her body to the ground, mount on top of her back, just like in the Livingston case. The victim never attacked the officer. She did keep her hand tucked under her chest, but never attacked the officer, just like in the Livingston case where even Deputy Werbelow, who Judge Harris was not only present in the room, but was also mounted on top of Livingston's head as he was face down, macing or pepper spraying him in the face, and then pulled him out by his own beard to the front porch. Just like in Smith, Deputy Werbelow admitted here that Livingston never punched, never kicked, never attacked, never did any motions threatening in any way to the officers, either of them. And the officer in Smith used the victim's continued refusal while on the ground to give up her hand and release it to be handcuffed as an excuse to then violently punch the victim in the side so hard that he broke her ribs. We would respectfully contend that the district court is correct, that Smith v. Ray does provide the requisite level of specificity to show that Livingston's excessive force claims and his rights to be free from them were clearly established. And Smith relied, this court in Smith, relied on law that has been here in this circuit for decades. Roland v. Perry in 1994. There, again, even the Livingston facts are even stronger than Roland because Roland involved a suspect who was on the street with even less protection under the Fourth Amendment. But there in Roland, a gentleman picked a $5 bill off the ground and the officer believed that he was picking up someone else's property.  The officer jerked him around, yelled at him, and the man did what? Just like Mr. Livingston, instinctively resisted and tried to pull away. And the key in both Roland and Smith, if I may read a quote from Smith that I believe is very, very important in this case. This court said at pages 102 to 103 in the Smith decision, that she instinctively took one step back when he startled her by suddenly slamming the door shut or that she pulled her arm from Ray's grasp and angrily demanded that he explain himself and did not give him license to significantly escalate the situation by throwing her down and jumping on her, as any reasonable officer would have known. For similar reasons, Smith's refusal to submit after he threw her down cannot justify Ray's decision to punch Smith repeatedly, breaking her rib. Under her version of events, she was simply defending herself against a sudden, all-out physical assault from an officer who had not given her any indication that he was acting with any legal justification. What should we do about Armstrong, where someone is very clearly passively holding on to a pole and refusing to let go of the pole, and he hasn't committed a crime, but the officer can seize him because of his mental condition? Yes. And the court said there's no probable cause to tase, but it wasn't clearly established. How do we apply that here? Well, the factual distinction that you just raised, Judge Rushing, is the key factual distinction. In Armstrong, there was lawful justification under the Fourth Amendment to seize and arrest that individual, and with it carries the right to use reasonable force under the circumstances to effectuate that arrest. And that simply is not the case here. So it all goes back to the right to arrest, not necessarily the amount of force used? So you're saying that if the officer had a right to arrest here, then the force used would be reasonable because of Armstrong? No, I would disagree respectfully, and I would do that on the basis of the clearly established rights as they were announced in Smith and Rowland, as well as other cases. We do not have the case on the tip of my tongue, and I'm happy to find it in our brief, where we cited a tasing case where the suspect had committed no crimes. I believe that I will find this case citation for the court, and the tasing was held excessive under those circumstances. I thought there were some cases, and you cited to this, is it Ray, the case that you were talking about? Smith v. Ray, yes, sir. But I thought there were some cases, perhaps out of circuit, that seemed to suggest that you consider these claims in isolation, so you take the unlawful arrest and entry claims separately. But then in deciding whether or not the force used was excessive, you sort of put that aside and assumed that the intrusion was warranted in deciding whether or not the level of force actually used was appropriate. Is that not correct? Well, I do not believe that is correct in one respect. It is correct that under the recent authority of the Mendez case, that the simple fact that an unlawful arrest or unlawful entry occurred cannot thereafter make a use of force, by definition, a 1983 actionable offense. However, you will end up in the same place following the proper analysis, and the proper analysis is spelled out in the seminal cases, Graham v. Conner, Tennessee v. Garner. Those cases hold that the factors that must be considered on any excessive force claim is what is the alleged crime at issue, what would a reasonable officer have believed the alleged crime was, and was the citizen resisting an arrest under those circumstances that would justify the use of force in response to that resistance. To get back to the Armstrong case, where the individual is simply wrapped around the pole, and in that case we thought it sufficient, or at least not clearly established, that the use of a taser would be appropriate. Well, the key distinction there, again, in Armstrong, is that when the reasonable officer is deciding what amount of force would be acceptable, and by the way, this court found that it was a constitutional violation to tase the individual in Armstrong, it just wasn't clearly established at the time. And Armstrong post-stated in this case. It did. So we do not rely on it for the clearly established prong of the qualified immunity analysis. We do not, and do not have to. I just pointed that out, that the court did find that was a constitutional violation. However, the key distinction is at the moment in time, the decision is being made by a reasonable officer on the scene, what amount of force would be reasonable here. The officers in Armstrong were allowed to understand that we are able to use force against this individual. We are allowed to force that person to submit in a reasonable manner, and by use of force if we have to. And that is one of the Graham versus Connor factors. Those same factors were applied by this court in Smith, in Roland, Myers versus Baltimore, Bailey versus Kennedy, all of those cases to hold that when a person has done nothing wrong, when a person has a lawful right to resist, an officer when deciding what amount of force to be used, those factors weigh as heavily as they ever could under the analysis in favor of the citizen in finding that the force was excessive. So that's why I believe you reach the same place if you follow the proper analysis and apply it to this case, you will reach the same place. And in the amount of time that I have, I would like to, if I may, also address why Mr. Livingston's right to be free from deadly force in that of November 2015. The two cases that I think are most applicable here would be the case of Brockington versus Boykins and the case of Harris versus Pittman. I believe Judge Harris authored the Harris versus Pittman opinion. Now, Harris was published this summer, June of 2019. However, Harris found that the conduct at issue occurred in 2012, and found that the rights were clearly established at that time to be free from deadly force and relied on Brockington, which was several years prior to even that, 2012. And both of those cases relied on Waterman, which the district court relied on here in this case. But in the Harris case and Brockington, the facts are very similar for purposes of this argument. They held that it was clearly established that an officer's decision to fire his weapon was unconstitutional when the following facts were present. The officer and the suspect had been engaged in a very serious hand-to-hand combat or confrontation during the struggle. It was understood in both cases that the officer did hold the reasonable belief that the suspect posed a serious threat of immediate harm, which would be a disputed fact in this case. But in those cases, it was accepted. Third, through the use of significant force in both cases, the officer managed to incapacitate or subdue the suspect such that the suspect was lying on the ground, unarmed, no longer providing any form of resistance, and several seconds go by and the officer, without warning, then fires multiple times at the suspect. And in both cases, this court held that when that suspect is lying there, unarmed, on the ground, incapacitated through the officer's use of force, a reasonable officer under those facts would no longer perceive a serious and imminent threat of harm from that suspect, and deadly force is not justified. What about the officer's statement in this case that he's got my taser? Are we supposed to credit that? And if we do, why isn't that enough to suggest at least some possibility that the use of deadly force would have been appropriate? Yes, and this court is not to, at this stage, on an interlocutory qualified immunity appeal, this court is not to credit the officer's statement as accepted fact. In fact, this very issue was addressed in Smith v. Ray as well. In that case, as well as Harris and Brockington, the officer contended on disputed facts that he reasonably believed the suspect was armed at the time. And in Smith, I can actually... Is it contested that the officer said that? It is not contested that the officer said that. In this respect, one of the eyewitnesses, Mr. Carroll, said that Deputy Cahagas said, he's got my taser. At the same moment of that testimony, however, Mr. Carroll said, Mr. Livingston did not have the taser. And I do disagree with my colleague on the taser facts. Okay, so that's disputed. But the question is whether or not that perception, from the officer's point of view, was reasonable. Right. And getting back to where I was headed, in the Smith, Harris, and Brockington cases, this issue was tackled. What is the court supposed to do if an officer claims at the time and on appeal that I reasonably believed that that person was armed? In all three of those cases, this court held that where the facts are disputed, and taking all of the facts and the inferences that go with them in the light most favorable to the non-moot party, here the plaintiff, that a reasonable jury could conclude that a reasonable officer would not have believed that the suspect was armed or dangerous at that time, despite the fact that the subjective belief of the officer, by saying he's got my taser, was that he held the taser. Well, there's a lot about this case I don't understand. But in those cases, as I recall, at least most of the cases, the officer was saying, I thought he had a gun. Yes. And I'm alone with this person, and I'm afraid that he's going to fire the gun at me and kill me. Yes, ma'am. In this case, as I understand it, the officer would be saying, I'm afraid he's got my taser, but he's lying on the ground, he's been tased, he's been maced, and there are two officers with guns on the premises. So I'm still not really seeing the, whatever the Garner standard is, the immediate threat of death or serious physical injury that he presents with or without a taser. Correct. And this court in Elliott held that an officer can't guess. There must be a sound basis to believe that the citizen poses that very threat. And I'll end my comments, if I may, by pointing out some very important factual distinctions on this taser point. Can I ask you a question? Yes, ma'am. Well, go ahead. Yes, I think they will address exactly the point you were raising, Judge Harris, and I'll be brief. Here are the facts in the record with citation of the record pages. The taser was never in Mr. Livingston's hand, though Clayton Carroll testified that for a moment it dangled on his pinky. He also testified it immediately thereafter fell off and went clunk, clunk, on the porch where everyone could hear. That's at record JA691-692 and JA683-84. Bradley Timmerman, the other eyewitness, testified that when Mr. Livingston instinctively slapped the taser away in pain that it fell off onto the porch, not being held in his hand. That is at JA1852. Cahagas rolled five feet away to the other side of the porch. The taser was nowhere in Mr. Livingston's hands as he was laid belly down, beaten and bleeding, and the taser had no prongs. It could not be shot at a distance. It was in drive-stun mode, which is not a deadly weapon. Those are at JA1436-1440. No reasonable officer would have believed that John Livingston posed a serious threat of death or bodily harm and that he was in his lawful right to simply slap the taser away. Thank you. Thank you, Mr. Ballew. Mr. Hartzog, you have some time left for rebuttal. I hate to do this, but I'm going to start you off with a question. I don't know if you were here for our first case today. I mean, the district court in this case, there were six separate actions that were consolidated, and I don't even want to know about the litigation that led to them being tried together. But, I mean, just by the time we get to Livingston, the officer in this case has some pretty serious credibility problems. And it's just maybe you can explain to me, I mean, right, there's all kinds of this excessive force. You're not even appealing some of the other excessive force. They're not findings, but findings that there are disputes for a jury to resolve. And it just seems that when you take these cases all together, like why doesn't a jury need to resolve, on top of all the other particular factual disputes here, just the credibility of this officer? I mean, I get that it's not contested that he said, oh, I think he has my taser, and that I assume he testified at his deposition that he believed that he was under threat, but he's got some credibility issues. Doesn't this have to go to a jury? No, Your Honor, because we're relying on the statements of the other three witnesses who were there. We're not just relying solely on Deputy Cahagas' testimony. And the other three witnesses said he had a reasonable belief that his life was in danger? I don't think any of the other witnesses can say that. That's right. That's why I don't understand why that would be helpful if that's the question, whether he reasonably believed that his life or physical safety was in danger. I've never seen a case like this where a police officer with this kind of pattern of conduct, some of which is not for purposes of appeal. Why do I do that? I think the answer to that, Your Honor, is you don't look at it from an objective perspective. You look at a reasonable officer's disposition with the knowledge he had at the time. It doesn't matter whether he has another prior use of force incident, which is contested, but it doesn't matter who the officer is. It matters what a reasonable officer in that situation that he found himself in would believe that they had the right to do. With qualified immunity analysis, you look at a reasonable officer in that position. A reasonable officer in that position would know that they had been involved in a long struggle, that they had not been able to get this guy under control, and that they had just lost control of their taser. I want to distinguish. The Armstrong decision itself distinguishes Rowland. Rowland is a case, and likewise with Smith, is a case where force was used without any prior warning. As plaintiff's counsel mentioned, there was a you're under arrest instruction here. That in itself distinguishes Smith and Rowland as decided by the Armstrong case. And so the fact that there was that warning, even if it's disputed as to whether or not there was cause for arrest, do you say we do factor that into the question of the level of force that an officer should use, or do we take these claims separately? I believe you do, Your Honor. Which one? I'm sorry. Well, you take those into account in terms of whether the right is clearly established, certainly, because the Armstrong decision says specifically we distinguish Rowland because Rowland there was no warning given, and in Armstrong there was a warning given. No, what I'm asking is whether or not, assuming that it's true that the officer said you're under arrest, but in fact there was no basis for that arrest, do we factor in the lack of a basis for arrest in determining the level of force, non-deadly force, that was appropriate in this circumstance? I think what you do, Your Honor, is you have to look at it, as Mendez said, you have to look at each particular Fourth Amendment violation on its own. So to the extent that he didn't have probable cause for the arrest, when he's trying to make the arrest and the level of an officer is never required under the Fourth Amendment to simply stop. Once they start arresting someone, it's important for officer safety and all kinds of reasons for that arrest to be completed, and the individual can challenge the arrest later  but you can't have a situation where an officer has to stop in the middle of an arrest because the level of force that they used didn't work. They're always required to complete that arrest when they start making it, and in this case, hands-on didn't work. You can see why in this case, and I'm going to recite the facts totally from the plaintiff's perspective, but you can see how that might leave someone a little concerned if the rule is you can literally kick someone's door down at 3.40 a.m. for no reason. No officer could reasonably have believed he had any justification for making an arrest, not to mention the exigent circumstances you would need even if you had probable cause to arrest to break someone's door down at 3.40 a.m., come in and use great amounts of force against them knowing full well he had no authority to make that arrest, but he should just keep going, keep going, keep going until he can get that person under control. That's a sort of alarming scenario, wouldn't you say? That scenario would be. Well, it's the plaintiff's version of the facts, and it's the district court found that on everything I just said, there is at least a dispute of fact. I think even under the plaintiff's evidence, and that's the point I'm making, under the plaintiff's version of events, the officer would have had reason to believe, and again, if the court decides there's not probable cause, that's still not standard for qualified immunity. It's whether a reasonable officer in that situation could have believed. But the district court said that there is at least a dispute of fact as to whether a reasonable officer could have believed he had authority to enter that home to make an arrest. So the rule you want us to adopt is that even if no reasonable officer could have thought he had a right to be in that person's house at 3.40 a.m. after kicking down the door,  you can see how that might go badly. Well, Your Honor, that's not the argument. It seems like it's the import of what you're saying. If we don't look to whether he had the authority to kick down that door at 3.40 a.m. when we consider whether he's allowed to use a teaser and pepper spray and throwing someone on the floor and punching someone to effectuate an arrest, then I think that is what you're saying. Well, I think what the court looks at is whether a reasonable officer would have believed, and if the court finds that no reasonable officer would have believed they had the right, then that's a different thing. But what I'm saying is... I think that was actually the question we were asking you. If the district court is right that on the plaintiff's version of the flex, no reasonable officer could have thought he had authority to make an arrest and enter that person's house at 3.40 a.m., then does it follow that he was not allowed to use force to effectuate that arrest? I think under that, if no reasonable person would have believed, then I agree with that proposition, Your Honor. But I believe the finding that no reasonable officer would have believed he had the right is a conclusion of law which is subject to review by this court. I believe I'm out of time. Thank you, Mr. Hartzog.
judges: Albert Diaz, Pamela A. Harris, Allison J. Rushing